**In re 1438 MERIDIAN PLACE, N. W., INC., A District of Columbia Corporation, Debtor.**

**Bankruptcy No. 81–00121.**

United States Bankruptcy Court, District of Columbia.

Oct. 21, 1981.

On Motion For Reconsideration Nov. 12, 1981.

90

Patrick J. Moran, Martin F. McMahon, Washington, D.C., for debtor.

John J. Donohue, Neighborhood Legal Services, Janet E. LaBella, LaBella & Johnson, Washington, D.C., for tenants.

MEMORANDUM OPINION

ROGER M. WHELAN, Bankruptcy Judge.

(Motion to Amend Caption and Pierce Corporate Veils and Debtor's Opposition Thereto)

The pending controversy between the debtor in possession, a District of Columbia corporation operating an apartment as rental property under a pending Chapter 11 case, and the tenant's association [1] represents but one stage of a long standing controversy between this debtor in possession as a landlord and its tenants. The tenants originally secured a jury verdict in the D. C. Superior Court in December 1980, based on a breach of warranty of habitability in the approximate amount of $34,000.

After several post-trial motions were filed by the debtor with respect to this jury verdict, and just prior to final docketing of the judgment itself, the debtor filed its Chapter 11 petition. The debtor in possession is now seeking in the context of this Chapter 11 recovery of the subject premises as part of its attempt to formulate a plan of reorganization in the pending Chapter 11 case. The tenants, who are tantamount to judgment creditors,[2] are at this time opposing the debtor in possession's attempt to recover the subject premises. As creditors, they are now seeking to pierce the corporate veil. In the tenant's motion to amend the caption and pierce the corporate veil, the tenants allege that the debtor is one of several corporations which is in fact the "alter ego" of Nick and Miranda Rangoussis.[3] The tenants argue that the Court in turn should pierce the corporate veil and treat all of the corporate entities as the alter ego of Nick and Miranda Rangoussis. What in fact is sought by the tenants as creditors in this case is to effectively consolidate the named corporate entities, together with the individuals Nick and Miranda Rangoussis, as debtors, and to consolidate their estates in connection with this pending Chapter 11 case. The debtor in possession, however, asserts that jurisdiction cannot be properly asserted over the parties by the United States Bankruptcy Court and that the matter should have been brought as an involuntary petition in bankruptcy. The debtor further argues that there is no merit to the creditor's assertion with respect to the "piercing of the corporate veil." For the reasons set forth in this Memorandum Opinion, and after due consideration of all the evidence, testimonial and documentary, the Court concludes that the motion to pierce the corporate veil should be granted. In order to fully explain the rationale behind this conclusion, the Court will set forth separately its Findings of Fact and will then treat seriatim each of the debtor's contentions with respect to its asserted defenses.

## FINDINGS OF FACT

While the basic facts are essentially uncontroverted as evidenced by the documen-

---

1. The tenant's association in this proceeding is composed of the following tenants, all of whom occupy rental premises at subject property; namely, 1438 Meridian Place, N.W.: Bertha Lindsay, Lucy Pierce, James and Ellen Pettaway, Edward and Mildred Ellington, Lilly Fair, Richard Turner, Eva Brooks, Minnie Clark, Anna Scott, Eva Johnson, Claudia Harrington, Charles and Barbara Andrews, and Wilburt Battle. The following tenants are also members of the unsecured creditors' committee as reflected by record in this jacket; namely: Wilbert Battle and Eva Brooks.

2. While the automatic stay provisions of 11 U.S.C. § 362(a) have resulted in an abatement of the pending D. C. Superior Court case, there is clearly no dismissal of that action, and it is clear from the facts of record that the tenants

in this case are also creditors by reason of their individual claims. See 11 U.S.C. § 101(4)(A).

3. Although the original pleadings attempt to name one Antonia Meravoglov, the tenants frankly concluded in their Memorandum of Law in Support of their Motion to Amend Caption and Pierce Corporate Veils filed July 6, 1981, at p. 6 that while she was listed as an officer of the corporation she appeared to have no dealings with it. Since she appears not to be an alter ego of the corporation, her assets will not be brought into the proceeding. Based on this admission and based further on a review of the evidence of record, the Court concludes that there is no evidence to link this individual with the various corporate entities involved in this proceeding.

tary and testimonial evidence adduced at the hearing conducted in the Bankruptcy Court on July 2, 1981, the inferences and conclusions to be drawn from this evidence are obviously susceptible to different opinions.

With respect to each of the eight corporations involved in this contested matter, all were incorporated in the District of Columbia between June 12, 1978 and June 26, 1979. As evidenced by the filing of annual reports with the Superintendent of Corporations for the District of Columbia, all reflect that Nick Rangoussis, Miranda Rangoussis, and Antonia Meravoglov are the officers and directors of each of the corporate entities. All reflect that there were 1,000 shares of par value stock authorized and issued, but there are no corporate records to reflect the actual issuance of stock to any particular stock holder of record. When considering the testimony of Nick Rangoussis, and the evidence of record, the Court concludes that as a matter of fact that no stock was ever issued. With respect to this issue it is clear that no stock certificates were ever produced and no documentary evidence of any type has been adduced as to the consideration paid for the issuance of any stock with respect to any of the corporate entities involved.

Each of the aforesaid corporate entities was apparently formed to correspond with the management and ownership of separate and distinct parcels of rental real estate in this jurisdiction; namely, 1436 Meridian Place, N.W., Inc.; 1438 Meridian Place, N.W., Inc.; 1460 Columbia Road, N.W., Inc.; 1464 Columbia Road, N.W., Inc.; 2714 Quarry Road, N.W., Inc.; 1708 Newton Street, N.W., Inc.; 1316 Euclid Street, N.W., Inc.; and 1419 Columbia Road, N.W., Inc. For the most part, the principal office is given as 475 H Street, N.W.,[4] Washington, D.C. Although separate bank accounts were opened for each of the separate corporate entities at the time of their incorporation, each of these accounts in turn reflects an initial deposit of only $50.00, and essentially all income and disbursements were transacted for a limited period of time through only one bank account located at Security National Bank and identified as Account No. 11–970–6. Based on the documentary evidence of record introduced in this proceeding, presumably all disbursements were affected through this account for the various properties. There is also documentary evidence to establish that certain personal obligations of the Rangoussises were paid from this account as well. Although separate rent rolls[5] were produced with respect to the rental properties located at 1436 and 1438 Meridian Place, N.W., there are no identifiable accounting records that intelligently segregate the income and expenses for each of the separate properties involved.[6]

4. Petitioner 1438 Meridian Place, N.W. and also 1436 Meridian Place, N.W. list as their principal post office address 475 H Street, N.W.

5. The rent rolls (Tenant's Exhibit 6) were all maintained on form sheets listed under the name of:
   "Nick Rangoussis
   3408 Wisconsin Ave., N.W.
   Suite 205A
   Washington, D. C. 20008"
   These rent rolls are, however, limited solely to reflecting the rent that was apparently paid from the various tenants located at these individual rental units. These rental rolls do not in any way reflect any running totals nor is there any indication from the rolls themselves as to the depository where these rents were deposited. While these rolls might ordinarily be sufficient in and of themselves in an otherwise organized business setting, they are clearly insufficient in this case to form a coherent and verifiable accounting record with respect to income and disbursements. Furthermore, the Court does not find the assertion of the debtor's principal officer that further records were maintained by former counsel credible based on the existing circumstances. Furthermore, it is interesting to note in this regard that the only corporate records of any substance produced in connection with this hearing were the rental rolls for 1436 and 1438 Meridian Place—no other corporate records such as tax returns, general journals or ledgers, stock transfer ledgers, etc., were ever produced nor is there any evidence that such records were ever maintained by the debtor.

6. While it might be possible to segregate some of the rents as to the subject properties, by way of outside accounting help, there is no indication that an accountant could satisfactorily produce accounting records which would be satisfactory to explain the operations of each of the

Moreover, with the exception of the debtor's introduction of the certificates of incorporation and the current annual reports, the debtor has, in fact, produced virtually no corporate records of any type, nor is there any credible evidence that any separate corporate records were, in fact, ever maintained by the debtor at his principal office or by any responsible subordinate. The evidence adduced by the tenants clearly reflects that all of the subject properties were, in fact, controlled and managed by Nick Rangoussis through the medium of one checking account. Furthermore, it is important to note that many of the operating expenses incurred for the subject properties were apparently paid by Nick Rangoussis personally as evidenced by Tenant's Exhibit No. 3.[7] In short, there is no way for the Court or the creditors to intelligently sort out and separate the financial affairs of the eight corporate entities involved, nor has there been any attempt by the debtor in possession to present a coherent and cogent accounting picture for the creditors at any time during the pending proceeding.

In connection with the subject properties, which are all located in the District of Columbia, it appears that all of the individual parcels were originally owned by Nick Rangoussis and/or his wife, as tenants by the entireties. These properties were subsequently transferred to the respective corporations as indicated by the various deeds introduced in evidence and the testimony adduced at trial. (*See for example*, Tenant's Exhibits Nos. 11 and 12 which are the deeds for 1438 Meridian Place, N.W., Inc., and 1436 Meridian Place, N.W., Inc.) More relevant, however, to the issue before the Court is the fact that all of the subject transfers were effected at some time subsequent to the actual incorporation of each corporate entity [8] involved and yet the individual tenant notices (Tenant Exhibit No. 19), directing payment of rent to "1436 Meridian Place, N.W." were sent as late as 1978—the time when the subject property in this case was still titled in the name of Nick Rangoussis.

Based on the existing evidence relating to the financial affairs of the debtor, it is clearly impossible to reconcile the income and expenses as they relate to the opera-

separate corporations during the relevant time period 1978 through 1981.

7. Although each of the checks are identified as expenditures for a given property, there is no centralized accounting which separates the financial affairs of the several corporate entities involved. In other words, there is no verifiable method for ascertaining the expenses and liabilities of any one corporation or, in turn, of ascertaining what may constitute amounts owed between the several corporations. This lack of verifiable accounting records becomes extremely important in connection with the various intercorporate claims listed by the debtor in Schedule A–3. For example, Schedule A–3 lists a debt from 1438 Meridian Place, N.W., to 1316 Euclid Street, N.W. in the *estimated* amount of $70,000. There is no evidence of record to reflect how this amount was calculated and certainly no accounting records of how the figure could in any way be documented or verified. It is also important to note with reference to the scheduling of amounts in Schedule A–3, that no exact amounts have been listed and all figures have in fact been rounded or estimated. It is important to further note in this regard that although the debtor disclaims any transfers of property from the debtor to other related corporate entities, there is evidence to the contrary; namely, checks

have been introduced by the tenant creditors that clearly reflect monies flowing from 1438 to 1436 Meridian Place, N.W., a debtor in a related Chapter 11 case. However, because the records are obviously incomplete on their face, there is no precise way of ascertaining the full extent of comingled funds. A further example of this is reflected with reference to checks 221 through 228 which were drawn on the 1438 Meridian Place account and by Rangoussis' own notations were used for 1436 Meridian Place, N.W. Furthermore, Check No. 226, in this batch, was drawn to "475 H Street Joint Venture" and the only mention or indication as to what this joint venture is is by way of reference to the Schedules which indicate that 475 H Street, N.W. is given as the debtor's post office address and apparent principal place of business. This is true as well for the other corporations involved in this proceeding.

8. For example, although 1438 Meridian Place, N.W. was incorporated in June, 1978, the subject real estate which constituted its sole and only asset was not in fact transferred of record to the corporation until July, 1980. This is apparently true as well for the other corporations involved in this proceeding.

tions and management of the debtor's various rental parcels. It is further clear from the evidence of record, particularly with reference to the context of the other corporate entities, that all of these various corporations were and are, in fact, the alter ego of the principal officers, Nick and Miranda Rangoussis. There has been no attempt to comply with any corporate formality, other than the fact of incorporation itself. It is further clear from the evidence of record that based on the nature and size of the rental operations involved, and as evidenced by the testimony of Mr. Rangoussis himself that the rentals received during the 1979 period were in the approximate amount of $3,000 a month on the debtor's property at 1436 and 1438 Meridian Place, N.W.—that the corporate entities at the time of their incorporation were clearly undercapitalized. The evidence of record reflects that this applies as well to the other corporations. In view of the paucity of records available and after reviewing the evidence of record taken during the trial, the record shows that all of the subject real estate was the only asset in connection with their incorporations. Further, the subject property was not legally available to the corporation at the time of its incorporation.

An analysis of the debt structure in the debtor's case (see Schedules A–1 through A–3) (and this is certainly true of the debtor at 1436 Meridian Place, N.W. as well), reflects that the major creditors are all secured (See Schedule A–2), and that the bulk of the unsecured creditors are in fact insiders within the meaning of 11 U.S.C. § 101(25).[9] Although the only asset of any significant value is the subject real estate located at 1438 Meridian Place, N.W., which has been scheduled by the debtor as having a value of $600,000.00, there is no credible evidence adduced by the debtor as to how this figure was calculated. As noted by the

tenant creditor's association in their proceeding, there is already some evidence that the subject property, by way of the testimony of an appraisal witness, is in the range of only $250,000.00.

## CONCLUSIONS OF LAW

### I. Lack of personal jurisdiction over non-debtor parties

■ The debtor advances several arguments as to why the Court lacks jurisdiction over the named non-debtor parties in this case. Basically, the argument is predicated on the lack of personal jurisdiction over the six non-debtor corporate entities as well as their officers, Nick and Miranda Rangoussis. In this regard, the debtor asserts that the tenant creditors should have filed either an adversary proceeding, joining as defendants the non-debtor parties, or in the alternative that the tenant creditors should have filed an involuntary petition against these same persons. While this argument is not without merit in a theoretical context, it overlooks the important facts present in this proceeding; namely, (1) the broad jurisdictional grant to the United States Bankruptcy Court (see 28 U.S.C. § 1471(e) which grants jurisdiction to the Court over all the debtor's property wherever located), as well as the Court's broad powers as a court of equity (see 28 U.S.C. § 1481; *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), and (2) the fact that the matter before the Court is not an adversary proceeding, nor is there any requirement that the relief requested be by way of an adversary proceeding. Bankruptcy Rule 701 specifically limits adversary proceedings to actions to:

"(1) recover money or property, other than a proceeding under Rule 220 or Rule 604, (2) determine the validity, priority,

---

**9.** Of $174,921.00 (incorrectly scheduled as $111,811.00) in unsecured debt (A–3), a total of $123,000.00 is due to insiders (Nick Rangoussis and Miranda Rangoussis) or related corporate entities (namely, 1316 Euclid St., N.W. and 1460 Columbia Road, N.W.). Of the remaining $51,921.00 in scheduled unsecured claims, $39,-500.00 is due to debtor's former attorneys of

record—Miller, Loewinger & Assoc. Interestingly enough, the tenants, who now seek relief by "piercing the corporate veil" are not scheduled as general unsecured creditors—but these tenants who now bring these proceedings clearly constitute the largest group of unsecured creditors in this Chapter 11 case.

or extent of a lien or other interest in property, (3) sell property free of a lien or other interest for which the holder can be compelled to take a money satisfaction, (4) object to or revoke a discharge, (5) obtain an injunction, (6) obtain relief from a stay as provided in Rule 401 or 601, or (7) determine the dischargeability of a debt. . . . "

An action, such as the instant action, to amend the caption and in effect to cause a consolidation of several related estates by way of piercing the corporate veil, is not one within the purview of Bankruptcy Rule 701 by its clear and unambiguous language. Accordingly, a pleading of this nature is a contested matter within the Bankruptcy Rules, and it is well established that contested matters are properly initiated by motion pursuant to Bankruptcy Rule 914.

■ Furthermore, and of greater relevance with respect to this Court's assertion of jurisdiction over these named non-debtor parties in the context of this proceeding is the well established principle of law that "jurisdiction over the subsidiary will support jurisdiction over the parent" *Empire Steel Corp. v. Superior Court,* 56 Cal.2d 823, 832, 17 Cal.Rptr. 150, 366 P.2d 502 (1961), *cited in Sheard v. Superior Court,* 40 Cal. App.3d 207, 114 Cal.Rptr. 743, 745 (1974), *cited in Lakota Girl Scout Council, Inc. v. Harvey Fund-Raising Management, Inc.,* 519 F.2d 634, 638 (8th Cir. 1975). In fact, the Court in *Lakota* went on to state that:

> "Upon analogy we are persuaded that where a corporation is the alter ego of the stockholders so as to justify disregard of the corporate entity jurisdiction over the corporation will support jurisdiction over the stockholders. *Sheard v. Superior Court,* 40 Cal.App.3d 207, 114 Cal.Rptr. 743, 745 (1974), *cited in Lakota Girl Scout Council, Inc. v. Harvey Fund-Raising Management, Inc.,* 519 F.2d 634, 638 (8th Cir. 1975).

In this proceeding a motion was duly filed to "Amend Caption and Pierce Corporate Veils" and notice and hearing was properly served upon the debtor in possession in accordance with the local rules. The Bankruptcy Court clearly has subject matter and personal jurisdiction over the property of both debtors. Accordingly, where there are proper substantive grounds to pierce the corporate veil as to 1436 and 1438 Meridian Place, N.W., Inc., and as to the debtor's principal officers and other related and wholly owned corporations, they cannot then be heard to argue that there is no personal jurisdiction so that the Court cannot determine that such parties are in fact the alter ego of the petitioner. Clearly there can be no argument that the parties presently before the Court are without notice or will be deprived of any substantive rights, where all the named parties are on notice of the relief requested and where the basis for bringing them before the Court is by way of piercing the corporate veil or establishing relief by means of an alter ego theory.

■ Finally, debtors complain that the tenant creditors should have complied "with the formalities of the Bankruptcy Act in the bringing of an involuntary bankruptcy proceeding." (See Debtor's Response to Memorandum of Law in Support of Motion to Amend Caption and Pierce Corporate Veils.) This assertion misses the mark completely. The tenant creditors are in fact creditors of only 1438 Meridian Place, N.W., and they could not comply with the mandated requirements of 11 U.S.C. § 303(b) which requires that:

> "(b) An involuntary case is commenced by the filing with the bankruptcy court of a petition under Chapter 7 or 11 of this title—
>
> (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability ... if such claim aggregate at least $5,000 more than the value of the lien on property of the debtor securing such claims held by the holders of such claims;
>
> (2) if there are fewer than 12 such holders ... by one or more of such holders that hold in the aggregate at least $5,000 of such claims."

Moreover, since there is already a pending Chapter 11 case by the debtor, 1438 Meridian Place, N.W., the tenant creditors have a right to bring additional parties before the Court where it is alleged that such parties are, in fact, the alter ego of the debtor.

## II. *Piercing the Corporate Veil*

■ The law is well established that the burden of proof with respect to the disregard of a corporate entity is on the party who asserts such a claim. This is mandated because a corporation and its stockholders are perceived to be separate and distinct from the corporate entity itself. *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681 (4th Cir. 1976). Furthermore, the piercing of the corporate veil is recognized as a "drastic approach authorized only in the most extreme circumstances" *Karlin v. Avis*, 326 F.Supp. 1325, 1331 (E.D.N.Y.1971), and where it is necessary to prevent fraud or injustice. *Frank McCleary Cattle Co. v. Sewell*, 73 Nev. 279, 317 P.2d 957 (1957), 1 .Fletcher, Cyclopedia of the Law of Private Corporations, Section 41.3 (Perm.Ed.1974).

While it is clear from a review of numerous cases decided in this area [10] that there is no magic formula or litmus paper approach to reaching a determination of the propriety of the piercing of the corporate veil, it is clear that the Court must carefully consider a number of relevant factors before deciding to employ such a drastic remedy. After review of the testimony and documentary evidence received in this proceeding, the Court is well satisfied that the tenant creditors have sustained, by concrete and cogent evidence, the required standard for the

piercing of the corporate veil. The evidence of record clearly shows a total disregard of the corporate fiction. Further, the actions of the debtor's principal officer have resulted in working a clear and manifest injustice on the tenant creditors in this case. This becomes obvious in the context of this Chapter 11 case where the outstanding unsecured creditor interests are prohibited from reaching other assets outside of the corporation. The Court's conclusions with respect to the piercing of the corporate veil are, in the context of this case, warranted by reliance on the following factors:

■ First, the corporations failed to observe any corporate formality such as the maintenance of basic corporate records (i. e., journals or ledgers). Second, there was an absence of any relevant corporate financial records relating to such matters as stock transfers or tax returns. Third, there was under-capitalization of the debtor corporations from their inception. Fourth, there was dominance of all of the corporate entities by the principal officer and his wife. Further, there was comingling of the funds of all the corporations into one corporate account, and there was disbursements of corporate monies to all the related corporations named in this proceeding from this account as well as to the individuals, Nick and Miranda Rangoussis. Finally, it is important to note that the individual assets were not in fact acquired by the corporations involved until sometime subsequent to the actual incorporation process itself.

The case law dealing with the piercing of the corporate veil is already legend and need not be repeated here, but the clear

---

**10.** An appropriate summary has been set forth in 1 Fletcher, Cyclopedia of the Law of Private Corporations, Section 41.3 at 43 (Cum.Supp. 1981):

"Other factors that are emphasized in the application of the doctrine are failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, nonfunctioning of other officers and directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant

stockholder or stockholders. The conclusion to disregard the corporate entity may not, however, rest on a single factor but must involve a consideration of the aforementioned enumerated factors; in addition, the particular situation must generally present an element of injustice or fundamental unfairness. Undercapitalization, disregard of corporate formalities and the like coupled with an element of injustice, fraud or fundamental unfairness has been regarded fairly uniformly to constitute a basis for an imposition of individual liability under the doctrine." [footnotes omitted]

tenor of decided cases clearly shows that when a corporation has become a mere instrumentality of another, the Court is clearly justified in awarding appropriate relief.[11] The instrumentality rule is generally stated in terms of related corporations, but it need not necessarily be so:

> "The Rules applicable to parent and subsidiary corporations apply with equal force to cases of a person holding all or most of the capital stock of a corporation. If it is his mere instrumentality, its separate corporate entity will be disregarded and he will be held personally liable." 2 R. Powell, The Law of Real Property at p. 225[2][a], § 11 (Rev.Ed.1973) cited in *Old Town Development Co. v. Langford, supra,* 349 N.E.2d at 778.

■ It is abundantly clear from the consideration of the totality of facts in this proceeding that the debtor corporations, and the related corporate entities named, are in fact the alter ego of Nick and Miranda Rangoussis. It is further clear, based on the inability on the court and creditors to decipher and separate the affairs of the named separate corporate entities involved, that consolidation of the debtor's estates and those of the other named corporations as well as the individuals, Nick and Miranda Rangoussis, will not work an injustice in this case on the creditors—either secured or unsecured. The Court has carefully considered all the factors in this regard and has determined that in fact, consolidation of all the various entities into one bankruptcy estate will not prejudice either the secured or unsecured creditors. (See *Chemical Bank New York Trust Co. v. Kheel,* 369 F.2d 845 (2d Cir. 1966).[12] The secured creditors can, of course, have clear recourse to the individual parcels of real estate involved by reason of their various deeds of trust and tax liens. If there is any equity left in the subject properties, after the secured creditors are paid, then this will become available to the unsecured creditors without any resulting prejudice to overall creditor interest.

For the reasons stated, this Court concludes that the relief requested by the tenant creditors in their Motion to Amend the Caption and Pierce the Corporate Veil should be granted.

## ON MOTION FOR RECONSIDERATION

There is now pending before this Court a motion for reconsideration, alteration, and amendment of this Court's order of October 21, 1981, which pierced the corporate veil of eight corporations, found to be the alter ego of Nick and Miranda Rangoussis. As a result of such a finding, the Court ordered the eight named entities to be treated as debtors in the pending Chapter 11 case of 1438 Meridian Place, N.W., Inc., and that the 1436 Meridian Place case be consolidated with the 1438 Meridian Place proceeding. The Court has reviewed the motion and the attached memorandum and for the reasons to be stated in this memorandum, finds that the motion for reconsideration should be denied.

## CREDITOR PREJUDICE WILL NOT RESULT

First, in the motion for reconsideration, reference is made to creditor prejudice

---

11. An analysis of the more common factors involved has been appropriately set forth in *Old Town Development Co. v. Langford,* 349 N.E.2d 744, 778 (App.Ind.1976) where the Court held:
"To establish the requisite degree of control, courts consider numerous factors. [footnote omitted] To name a few—ownership of the subsidiary's capital stock, common directors or officers, financial support of the subsidiary's operation by the parent, the subsidiary being without substantial business contacts except for the parent, the subsidiary's acts referred to or treated as those of the parent, use of the subsidiary's property by the parent as its own, directors or executives of the subsidiary not acting independently, and failure of the subsidiary to observe formal legal requirements, such as keeping separate records and filing needed reports.[40]

40 Additional factors may consist of inadequate capital structure of the subsidiary, parent's payment of the subsidiary's expenses, and the subsidiary's assets provided solely by the parent.

12. In order to avoid prejudice to the creditors secured against separate parcels of real estate, the Court will require, by its order, that separate accounts be maintained for each individual parcel of real estate.

which might result from the Court's action in its order of October 21, 1981, as the shares of certain named corporations; namely, 1460 Columbia Road, N.W., Inc.; 1464 Columbia Road, N.W., Inc.; 1419 Columbia Road, N.W., Inc.; and 1316 Euclid Street, N.W. were all transferred and sold on May 12, 1981, as evidenced by an attached exhibit (see Debtor's Exhibit D). The debtor further claims that "the new owners did not know that the corporations would be thrown into a bankruptcy proceeding." The Court finds such allegations to be extremely exaggerated at best, and in complete disregard of the facts adduced at a court hearing conducted in the Bankruptcy Court on July 2, 1981. It certainly appears to the Court that Mr. Rangoussis, as a principal of the debtor, is either engaged in fabrication of the worst kind or is attempting an alternative remedy evidenced by an act of extreme desperation.

■ It is clear from the evidence of record in the pending Chapter 11 proceeding that Mr. Rangoussis was on notice of the motion to amend the caption which had been instituted by the 1438 Meridian Place tenants on May 4, 1981, and that the motion was set for hearing on July 2, 1981. The alleged assignment (see Exhibit D) was executed on May 12, 1981, over one week after the tenants had filed their action requesting a piercing of the corporate veil as to all of the named corporations involved in this proceeding. Exhibit D, on its face, attempts to transfer the stock in the aforesaid corporations to a named limited partnership. However, the testimony adduced from Nick Rangoussis at the hearing before this Court on July 2, 1981, clearly reflects that Nick and Miranda Rangoussis were the purported stockholders in all of these corporate entities. At no time during these court proceedings held in July of 1981 was any mention ever made of the alleged transfers. The Court would have to conclude, based on the evidence before it, that the purported transfer of stock in these corporations amounts to a "sham" transaction.

In addition to the fact that Mr. Rangoussis testified under oath on July 2, 1981 that he and his wife were the owners of all the stock of eight corporations, it should also be noted that the debtor never bothered to inform the Court subsequent to the trial that these "transfers" had taken place.

It was only after the Memorandum Opinion and Order which pierced the corporate veil was issued that the debtor decided to inform the Court that these "transfers" had taken place. This leads the Court to conclude that either Nick Rangoussis was not telling the truth to this Court while he was under oath on July 2, 1981 (when he told the Court that he and his wife owned the stock in all the corporations, when in fact a transfer had occurred on May 12, 1981), or that the debtor was telling the truth on July 2, 1981 and is now fabricating a story about transfers which allegedly occurred on May 12, 1981. Further, it was also adduced at the trial that stock had never been issued in any of these corporations. Now the Court is asked to believe that the stock has been sold to other parties. This is rather unbelievable to say the least.

Furthermore, the Court has carefully considered all of the matters pertaining to the named individuals and corporations involved and allegations concerning prejudice to creditors is not in any way substantiated by the pending motion. Reference is made on page 4 of the Debtor's Memorandum to "a local bank" but no details are supplied as to the nature of the security or the amount of debt involved. It would clearly appear, from the evidence already received of record in connection with the July 2, 1981 hearing, that such a bank would apparently be a secured creditor and the court can find no prejudice to such creditor in view of the specific requirements set forth in its Order of October 21, 1981 which required that separate records as to each of the parcels of real estate be kept.

As is clear from the record, no serious contentions are made as to the evidence received in connection with the original July 2, 1981 hearing. Most of this evidence was of an uncontested nature and dealt with questions of fact relating to the debtor's affairs. Recognition of creditor inter-

est by the debtor can obviously not be ignored and the debtor's memorandum itself would seem to recognize this fact.

Further, in the Debtor's memorandum in support of their motion for reconsideration, reference is made to construction continuing at 2714 Quarry Road, N.W., Inc., and allegations are made that prejudice might result to secured creditor interests involved with that particular parcel of real estate. It should, however, be pointed out that this Court's order of October 21 specifically mandates that separate books and records be kept as to each of the separate parcels of real estate located in this jurisdiction and that no foreclosure can occur at this date in view of the automatic stay provisions in effect by reason of 11 U.S.C. § 362(a) (*See* Order of October 21, 1981 at p. 1).

## SEPARATE BOOKS AND RECORDS SHOULD BE MAINTAINED

Debtor, in its memorandum at page six, argues that "this Court [should] condition its Order on a determination being made, after a hearing, that the books are too intermingled to arrange." It should be pointed out that documentary evidence was received by this Court at the July 2, 1981 hearing, not only from the tenants, but from the debtor as well, that there were no identifiable records except for the rent rolls (and these, as pointed out in the Court's prior memorandum opinion, were of limited value when placed in the context of the overall affairs of all these corporations). Further, evidence established that there was a comingling of funds between all of the named corporations. In addition, no journals or ledgers were ever introduced by the debtor in connection with any of the corporate operations, nor was there any relevant documentary evidence supplied by the debtor with reference to the "separateness" of the named corporate entities involved in this proceeding. Now, the debtor states that this Court should condition its order after a hearing has been made that the books are too "intermingled to arrange." This argument is moot. There was already a hearing before this Court relevant to that issue. There was evidence adduced at the July 2, 1981 hearing that showed the corporations never maintained separate books and records. That is why this Court ordered "that separate financial records reflecting the income and disbursement as to each of the following properties shall be separately maintained as to each of the following properties so as to protect the interest of the secured creditors on those properties." This means that, at the very least, separate books and records shall be kept from the date of the order; namely, October 21, 1981, as to each of the properties. Inherent in this order, and within the context of the Chapter 11 proceeding, is the requirement that the debtor is going to have to deal with the secured creditors and therefore will have to make an accounting. In addition, a corporation of this sort should be keeping books and records anyway; i. e., so accurate tax returns can be filed. This Court therefore finds that it has already addressed the issue of the intermingling of funds and will not relitigate this issue.

## CONSOLIDATION IS APPROPRIATE

The debtor further argues that consolidation, ordered by this Court's order of October 21, 1981, is a "drastic remedy and may not be necessary under the circumstances of this unusual proceeding." There already has been an extensive trial hearing in the Bankruptcy Court with respect to all evidence involving the affairs of not only the debtor corporations, 1438 and 1436 Meridian Place, N.W., but the involvement of Nick and Miranda Rangoussis with other related corporate entities, namely, 1460 Columbia Road, N.W., Inc.; 1316 Euclid Street, N.W.; 1464 Columbia Road, N.W., Inc.; 1419 Columbia Road, N.W., Inc.; 2714 Quarry Road, N.W., Inc.; 1708 Newton Street, N.W., Inc. Emphasis is placed on the fact (see page 5 of Debtor's Memorandum) that "this is a rather small operation, where one man and his wife have found themselves entwined in a legal process they barely understand." Such an argument, at this late date, hardly engenders sympathy when one considers the magnitude of the real estate operations engaged in by the debtor and his wife. This is hardly a small operation by

any means, as the evidence establishes that real estate, formerly owned by the debtors, was transferred into eight separate corporate entities, each of which continued to manage its real estate affairs without the benefit of corporate formalities. Although, perhaps lacking a formal education, the debtor's president is, in the opinion of the Court, a shrewd and calculating businessman who has chosen to conduct his affairs in an out-of-pocket fashion. All of the subject properties were treated in substantially the same way as they were prior to the period of incorporation, and as a result of Mr. Rangoussis' own actions, he should not now be heard to complain when creditors have attempted to set the record straight.

For the foregoing reasons, the motion for reconsideration, alteration, and amendment of this Court's Order of October 21, 1981, is denied.